# REDACTED

## No. 24-4470

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SEAGATE TECHNOLOGY LLC, *et al.*,

*Plaintiffs-Appellants*,

v.

NHK SPRING CO., LTD., *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:19-md-02918-MMC, 3:20-cv-01217-MMC
Hon. Maxine M. Chesney

## APPELLANTS' REPLY BRIEF

Robert N. Hochman
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
rhochman@sidley.com

David R. Carpenter
Nicole M. Baade
SIDLEY AUSTIN LLP
350 S Grand Ave.
Los Angeles, CA 90071
(213) 896-6000
drcarpenter@sidley.com

Steffen N. Johnson
John B. Kenney
WILSON SONSINI
GOODRICH & ROSATI, PC
1700 K Street, N.W.
Washington, DC 20006
(202) 973-8800
sjohnson@wsgr.com

Jeremy D. Rozansky
SIDLEY AUSTIN LLP
1501 K St. NW
Washington, DC 20005
(202) 736-8000
jrozansky@sidley.com

*Attorneys for Plaintiffs-Appellants Seagate Technology LLC* et al.
[Additional Counsel Listed on Inside Cover]

Kenneth O'Rourke
Jeff VanHooreweghe
Mikaela E. Evans-Aziz
WILSON SONSINI
GOODRICH & ROSATI, PC
One Market Plaza
San Francisco, CA 94105
(415) 947-2000

## TABLE OF CONTENTS

INTRODUCTION.....................................................................................1

I.   SEAGATE MAY PURSUE CLAIMS BASED ON ALL SALES......5

   A.   The Sherman Act applies because NHK's anticompetitive, non-export conduct occurred in the United States................5

   B.   All sales are subject to the Sherman Act by virtue of the FTAIA's effects exception......................................................12

II.  SEAGATE MAY PURSUE CLAIMS FOR THE PRICE-FIXING OF PRODUCTS INCORPORATED INTO HARD DRIVES FOR IMPORT INTO THE UNITED STATES.....................................24

   A.   The import exclusion preserves these claims.......................24

   B.   The import effects exception also preserves these claims....29

III. THERE IS AT LEAST A TRIABLE ISSUE THAT SEAGATE LLC WAS THE DIRECT PURCHASER OF ALL SUSPENSIONS FROM NHK.....................................................................................30

CONCLUSION ...................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson,*
513 U.S. 265 (1995)..................................................................26

*Animal Sci. Prods., Inc. v. China Minmetals Corp.,*
654 F.3d 462 (3d Cir. 2011) .......................................24, 27

*Apple Inc. v. Pepper,*
587 U.S. 273 (2019)..................................................................34

*Biocad JSC v. F. Hoffmann-La Roche,*
942 F.3d 88 (2d Cir. 2019) .................................................11

*Canela v. Costco Wholesale Corp.,*
971 F.3d 845 (9th Cir. 2020)...............................................31

*Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.,*
227 F.3d 62 (3d Cir. 2000) ), *overruled in part by Animal
Sci. Prods., Inc. v. China Minmetals Corp.,*
654 F.3d 462 (3d Cir. 2011) ...............................................6

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
2016 WL 7805628 (N.D. Cal. Aug. 4, 2016), *rev'd and
remanded on other grounds,* 720 F. App'x 835 (9th Cir.
2017)...........................................................................34, 35

*Cir. City Stores, Inc. v. Adams,*
532 U.S. 105 (2001)..................................................................26

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
370 U.S. 690 (1962).....................................................................5

*CSR Ltd. v. CIGNA Corp.,*
405 F. Supp. 2d 526 (D.N.J. 2005).......................................28

*Empagran S.A. v. F. Hoffman-La Roche, Ltd.*,
 2001 WL 761360 (D.D.C. June 7, 2001), *rev'd*, 315 F.3d
 338 (D.C. Cir. 2003) ............................................................... 10

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
 542 U.S. 155 (2004)......................................... 3, 9, 15, 18, 23

*Hewlett-Packard Co. v. Quanta Storage, Inc.*,
 961 F.3d 731 (5th Cir. 2020)............................................... 8

*Joseph Muller Corp. Zurich v. Societe Anonyme de Gerance et
 D'Armement*,
 451 F.2d 727 (2d Cir. 1971) ............................................... 5

*Kruman v. Christie's Int'l PLC*,
 284 F.3d 384 (2d Cir. 2002) .................................... 11, 15, 28

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
 731 F.2d 909 (D.C. Cir. 1984) ............................................. 5

*In re Lithium Ion Batteries Antitrust Litig.*,
 2017 WL 2021361 (N.D. Cal. May 12, 2017)................... 16, 22

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
 753 F.3d 395 (2d Cir. 2014) ........................................... 8, 11

*McLain v. Real Est. Bd. of New Orleans, Inc.*,
 444 U.S. 232 (1980)...................................................... 5, 10

*Minn-Chem, Inc. v. Agrium, Inc.*,
 683 F.3d 845 (7th Cir. 2012)............................................... 18

*Motorola Mobility LLC v. AU Optronics Corp.*,
 775 F.3d 816 (7th Cir. 2015)......................................... 11, 23

*Mujica v. AirScan Inc.*,
 771 F.3d 580 (9th Cir. 2014)............................................. 29

*In re Optical Disk Drive Antitrust Litig.*,
 2017 WL 11513316 (N.D. Cal. Dec. 18, 2017) ................... 22

iv

*Shields v. Fed'n Internationale de Natation,*
    419 F. Supp. 3d 1188 (N.D. Cal. 2019) ............................................... 27

*Sun Microsys. Inc. v. Hynix Semiconductor Inc.,*
    608 F. Supp. 2d 1166 (N.D. Cal. 2009) ......................................... 22, 32

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    781 F. Supp. 2d 955 (N.D. Cal. 2011) ......................................... 16, 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    785 F. Supp. 2d 835 (N.D. Cal. 2011) ............................................... 16

*United States v. Aluminum Co. of Am.,*
    148 F.2d 416 (2d Cir. 1945) ......................................................... 7, 8

*United States v. Hui Hsiung,*
    778 F.3d 738 (9th Cir. 2015) ................................. 11, 15, 16, 18, 19, 20

*United States v. LSL Biotechnologies,*
    379 F.3d 672 (9th Cir. 2004) ........................................................... 7

*United States v. Sisal Sales Corp.,*
    274 U.S. 268 (1927) ....................................................................... 5

*United States v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940) ...................................................................... 17

*Yamaha Motor Corp., U.S.A. v. Calhoun,*
    516 U.S. 199 (1996) ...................................................................... 31

**Statutes**

15 U.S.C. § 1 ..................................................................................... 10

15 U.S.C. § 2 ..................................................................................... 10

15 U.S.C. § 6a .................................................................. 4, 12, 24, 26

15 U.S.C. § 6a(1) ......................................................................... 3, 15

15 U.S.C. § 6a(1)(A) ......................................................................... 18

15 U.S.C. § 6a(1)(B) ......................................................................... 18

15 U.S.C. § 6a(2) ................................................................ 4, 31

**Legislative Materials**

*Foreign Trade Antitrust Improvements Act: Hearing on H.R.
2326 Before the Subcomm. on Monopolies & Com. L. of the
H. Comm. on the Judiciary*, 97th Cong. 1 (1981) ................................. 9

H.R. 2326, 97th Cong. (1981) ............................................... 19

H.R. Rep. No. 97-686 (1982) ............................................. 7, 19

**Other Authorities**

Fed. Trade Comm'n, U.S. Dep't of Justice, *Antitrust Guide-
lines for International Enforcement and Cooperation* (Jan.
13, 2017), https://tinyurl.com/3dhyr6kb ................................. 6, 25, 29

Restatement (Second) of Foreign Relations Law (1965) .......................... 5

## INTRODUCTION

NHK's U.S.-based subsidiary participated in a rigged bidding process in the United States. NHK entered into a master agreement in the United States with a U.S.-based customer that included fixed prices, set forth all key terms, and bound all of that U.S. customer's affiliates in its supply chain. Then, each time the U.S. customer requested a new quote for new specifications, NHK rigged that process and fixed the prices the customer was forced to accept, including for goods that would be imported here.

Yet NHK declares that none of this triggers the Sherman Act. NHK says Congress decided that the Sherman Act will not apply to domestic anti-competitive conduct—conspiring with competitors, rigging domestic bidding, and adopting a domestic binding agreement with fixed prices—*if* the ministerial acts of ordering and paying for shipment under that contract are performed by the U.S.-based customer's foreign affiliates carrying out orders from the U.S.-based company. That self-serving and counterintuitive rule finds no support in the Foreign Trade Antitrust Improvements Act's text, distorts the Act's purpose, is contrary to the Justice Department's statements about the Sherman Act's scope, and

1

exposes U.S.-based companies and domestic commerce to significant—and unremediable—anticompetitive conduct.

NHK tries to make sense of how it misreads the FTAIA by portraying the agreements and its rigged bidding process as playing a bit role in the commercial drama. In NHK's telling, nothing of any commercial or legal significance happened until NHK received the orders for suspension assemblies and payment through Seagate Technology LLC's (Seagate LLC) foreign affiliates. In truth, the Product Supply Agreement (PSA), to which pricing amendments were made after Seagate LLC accepted new bids, played the leading role in the parties' commercial dealings. ██

████████████████████████████████████████████████████

████████████████████████████████ 6-ER-1023-24. Price, allocation, quantity, and quality terms were all set in these agreements. 7-ER-1132. The PSA precluded Seagate's foreign affiliates from deviating from its terms or its amendments, *see* 7-ER-1135, and if, for some reason, there were a discrepancy between an order and the PSA, the PSA controlled, 6-ER-891. These domestic agreements were the object of the conspiracy and their corrupted terms ensured that price-fixed components would be imported into the United States.

Nothing in the FTAIA bars the Sherman Act from applying to all or at least some of the suspension assemblies sold in these agreements. Seagate's Opening Brief laid out four independent lanes for concluding that the Sherman Act applies to the purchases of price-fixed suspension assemblies at issue here. To prevail, NHK needed to show that *each lane* is closed. If *any* lane remains open, this Court should reverse.

First, all of Seagate LLC's claims against NHK should be restored because NHK's anticompetitive conduct occurred "in significant part" in the United States. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004). Contrary to NHK's view, the FTAIA never displaced the traditional rule that non-export conduct in the United States is subject to the Sherman Act. The FTAIA's text does not compel that result, and the Supreme Court has stated the FTAIA excludes only "'wholly foreign transactions as well as export transactions'" from the Sherman Act. *Id.* at 163 (emphasis omitted) (quoting H.R. Rep. No. 97-686 at 10).

Second, this case fits comfortably within the FTAIA's "effects exception" because NHK's price-fixing conduct had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. 15 U.S.C. § 6a(1). That conduct produced a sham "bidding" process that yielded a domestic

3

price-fixed PSA and amendments. Those effects—including the agreements themselves—straightforwardly "giv[e] rise to" Seagate's claims. *Id.* § 6a(2). NHK argues that the price-fixed PSA was "conduct" and not an "effect," but that makes no sense. The conduct was NHK's price-fixing conspiracy. The effect of that conduct—indeed its goal—was corrupted supply terms in the PSA and amendments.

Third, for the 33% of suspension assemblies imported into the United States, NHK's price-fixing "conduct involve[d] … import trade or import commerce" and at a minimum had the requisite "effect" on such commerce. *Id.* § 6a. NHK construes the phrase "involving import commerce" to exclude any transfer of products abroad. But that disregards the special attention Congress paid in the language of the FTAIA to protecting imports from being tainted by anticompetitive conduct.

Finally, the district court erred in concluding that Seagate LLC could not bring its own damages claims. Seagate produced extensive (largely undisputed) evidence showing that Seagate Thailand and Seagate Singapore were Seagate LLC's agents—they acted for Seagate LLC's benefit and at its direction—when issuing orders for suspension assemblies pursuant to the PSA. That makes Seagate LLC a "direct

purchaser" that can pursue the damages claims. It thus is clear that NHK's anticompetitive conduct gave rise to Seagate LLC's Sherman Act claims for all of the purchases of suspension assemblies pursuant to the PSA.

## I. SEAGATE MAY PURSUE CLAIMS BASED ON ALL SALES.

### A. The Sherman Act applies because NHK's anticompetitive, non-export conduct occurred in the United States.

The Sherman Act applies "to conduct occurring within, or having effect within, the territory of the United States." Restatement (Second) of Foreign Relations Law § 38 (1965); *accord McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232, 242 (1980). That basic territorial rule has been applied in a variety of cases, from those alleging that conduct in the United States monopolized a foreign market, *e.g., United States v. Sisal Sales Corp.*, 274 U.S. 268, 276 (1927), *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 702-08 (1962), to price-fixing in international commerce, *e.g., Joseph Muller Corp. Zurich v. Societe Anonyme de Gerance et D'Armement*, 451 F.2d 727, 729 (2d Cir. 1971); *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 923, 939-45 (D.C. Cir. 1984). Thus, to this day, the Federal Trade Commission and Department of Justice's *Antitrust Guidelines for International*

*Enforcement and Cooperation* specify that the Sherman Act applies "when some of the challenged conduct takes place in the United States"—what the Guidelines call "territorial conduct." 1-SER-5.

NHK engaged in "territorial conduct" by using its American subsidiary to coordinate a price-fixing conspiracy that rigged Seagate's Minnesota-based bidding process (along with the bidding process of another U.S. manufacturer). *See* 5-ER-872-73, 880, 885; 6-ER-994-1019. The Department of Justice's prosecution was thus a valid application of the Sherman Act. Likewise, the Sherman Act applies to this civil action arising out of the same territorial conduct.

NHK declares (at 18-19) that the FTAIA overturned the traditional rule that non-export anticompetitive conduct in the United States is subject to the Sherman Act. But that is not what Congress understood itself to have done, much less what the FTAIA's text says or what the Supreme Court has said Congress did.

The FTAIA accomplished two purposes. First, Congress "reliev[ed] exporters from a competitive disadvantage in foreign trade," by exempting export conduct within the United States from the Sherman Act. *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 71 (3d

6

Cir. 2000); *see also* H.R. Rep. No. 97-686, at 4 (explaining how law protects American businesses' "efficiency-enhancing joint export activities"). That is the only territorial conduct carved out in the FTAIA.

Indeed, that the FTAIA exempts domestic exporters from Sherman Act coverage necessarily means that Congress *otherwise* maintained the general territorial rule. By definition, exporters exempted by the FTAIA are engaged in conduct in the United States with anticompetitive consequences abroad. If the FTAIA made territorial conduct irrelevant whenever anticompetitive consequences are felt abroad, as NHK maintains, then the export exemption would be superfluous.

Second, Congress clarified "the proper test for determining whether United States antitrust jurisdiction over international transactions exists." H.R. Rep. No. 97-686, at 2; *see also id.* at 5-8; *United States v. LSL Biotechnologies*, 379 F.3d 672, 678 (9th Cir. 2004). In the main, the FTAIA codified the effects test first set forth by Judge Learned Hand in *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945) ("*Alcoa*"). *See* H.R. Rep. No. 97-686, at 5. NHK points out that the *Alcoa* test focused on "the situs of the effects as opposed to the conduct." NHK Br. 19. Notably, the agreements at issue there were purely foreign; no

7

conduct had taken place in the United States and no anticompetitive domestic agreements had been adopted. *Alcoa*, 148 F.2d at 443-44. Consistent with Supreme Court precedent in *Sisal* and others, Judge Hand acknowledged the agreements "would clearly have been unlawful, had they been made within the United States." *Id.* at 444. The effects test he innovated applied to foreign conduct and *supplemented* the site-of-the-conduct standard used for domestic conduct. *See id.*

Thus, in codifying the *Alcoa* effects test, the FTAIA clarified the rule as to *foreign* conduct without disturbing the settled rule that the Sherman Act applies to *domestic* conduct. *See Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 404 (2d Cir. 2014) ("Congress sought to clarify the legal standard determining when American antitrust law governs *foreign conduct*.") (emphasis added); *Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F.3d 731, 736-37 (5th Cir. 2020) (FTAIA two-part effects exception applies to "foreign conduct").

As the enacting Congress itself explained, the language in the FTAIA excluding "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations" merely excluded "wholly foreign transactions as well as export transactions." H.R. Rep.

8

97-686 at 10. The longstanding application of the Sherman Act to territorial conduct was preserved. *See Foreign Trade Antitrust Improvements Act: Hearing on H.R. 2326 Before the Subcomm. on Monopolies & Com. L. of the H. Comm. on the Judiciary*, 97th Cong. 1, 258 (1981) ("*H.R. 2326 Hearing*") (ABA Report noting FTAIA "corresponds to the traditional antitrust theory" that "a restraint i[s] subject to the antitrust laws both where it is 'in' and where it merely 'affects' interstate or foreign commerce" of the United States). The Supreme Court has accordingly expressly recognized that the first sentence of the FTAIA excludes only "wholly foreign transactions" and "export transactions." *Empagran*, 542 U.S. at 161.

Bypassing all of this history, and disregarding *Empagran*'s explanation that the FTAIA leaves "wholly foreign" commerce beyond the Sherman Act, NHK asserts that in the FTAIA's text Congress broadly removed domestic anticompetitive conduct from Sherman Act coverage whenever *some* foreign actor is involved. NHK Br. 15-16. Contrary to NHK's textual argument, the phrase "conduct involving trade or commerce … with foreign nations" merely explains which of the Sherman Act's two jurisdictional hooks the FTAIA alters. The Sherman Act

renders unlawful (1) "restraint[s] of trade or commerce among the several States" (i.e., domestic commerce) and (2) "restraint[s] of trade or commerce … with foreign nations" (i.e., foreign commerce). 15 U.S.C. § 1; *see also id.* § 2 (similar dichotomy). The FTAIA clarifies when the Sherman Act applies to foreign commerce. It changes nothing about how it applies to anticompetitive domestic commerce.[1]

To all this, NHK merely says that a handful of other cases should have come out differently if territorial conduct sufficed to trigger the Sherman Act. *See* NHK Br. 16-18. But the plaintiffs in those cases forfeited the argument about territorial conduct, so the courts did not address it. In *Empagran*, the district court concluded that domestic anticompetitive conduct would have been subject to the Sherman Act but for the fact that the plaintiffs sued on behalf of purchasers of the price-fixed vitamins produced "for delivery outside the United States," 2001 WL 761360, at *3 (D.D.C. June 7, 2001)—*i.e.*, the exception for export conduct—and never raised the territorial-conduct argument again.

---

[1] Thus, far from being a sideshow, the *McLain* requirement that plaintiff show a sufficient nexus to *interstate* commerce is the key jurisdictional inquiry here, and it is easily met because "the defendants' activity is itself in interstate commerce." 444 U.S. at 242. *Contra* NHK Br. 19 n.6.

10

Likewise, in *United States v. Hsiung*, 778 F.3d 738 (9th Cir. 2015), the United States focused on the import exclusion and effects exception because defendants' "price-fixing meetings took place abroad." Brief for United States *32, *United States v. Hsiung*, No. 12-10492 (9th Cir. Apr. 5, 2013), ECF 42.1.

NHK's nonbinding decisions are likewise distinguishable. In several, the complained-of conduct occurred abroad and actions in the United States were not independently anticompetitive. *See, e.g.*, *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 91-92 (2d Cir. 2019) (Russia); *Lotes Co.*, 753 F.3d at 402 (China). In *Kruman v. Christie's International LLC*, 284 F.3d 384 (2d Cir. 2002), the issue was a conspiracy to fix prices of services that were in effect *exported* to the plaintiffs. *Id.* at 391. And *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015), not only is a flawed, distinguishable decision, *see* Seagate Br. 46-48, 59-60; *infra* p. 23, but it involved the same conspiracy as in *Hsiung*, meaning that, in this Court, *Hsiung* (and not *Motorola*) controls.

No precedent disturbs the rule that anticompetitive conduct in the United States (other than export conduct) is subject to the Sherman Act.

That alone means the district court erred in applying the FTAIA to NHK's conduct.

### B. All sales are subject to the Sherman Act by virtue of the FTAIA's effects exception.

Even if the FTAIA applies, its "effects exception" preserves Seagate's entire claim. The effects exception applies the Sherman Act to foreign anticompetitive conduct so long as "such conduct has a direct, substantial, and reasonably foreseeable effect" on domestic commerce and "such effect gives rise to a claim" under the Sherman Act. 15 U.S.C. § 6a. Applying this exception requires answering a series of straightforward questions. First, what are the effects of NHK's anticompetitive conduct? Second, did those effects have a direct, substantial, and reasonably foreseeable effect in domestic commerce? And third, did those effects "give rise to," that is, proximately cause, Seagate's and its affiliates' Sherman Act claim? *See* Seagate Br. 37-40.

The domestic "effects" of NHK's anticompetitive conduct are plain: a corrupt "bidding" process that in turn produced the fixed prices enshrined in the PSA and its amendments. That was the goal of NHK's conspiracy. There is no meaning of the word "effect" that could plausibly exclude the rigged bidding process that the conspiracy achieved, much

less the price-fixed terms in the PSA, from the "effects" of NHK's anti-competitive conduct. It is no doubt true that the conspiracy will have downstream effects beyond these most immediate effects. But, as we discuss below, that is of no moment. What NHK refuses to accept is that the distorted bidding process and price-fixed terms are "effects" of its anti-competitive, conspiratorial conduct within the meaning of the FTAIA effects exception.

NHK never acknowledges this key point for a simple reason: the remainder of what the effects exception requires indisputably follows from recognizing that the tainted terms of the PSA and amendments are effects of NHK's anticompetitive conduct. ██████████████

████████████████████████████████████████████████

████████████████████████ 3-ER-311-12; 5-ER-792-97; 7-ER-1130-31.

████████████████████████████████████ 6-ER-902.

The tainted terms are themselves a substantial and foreseeable (indeed, directly *sought*) effect on domestic commerce. And finally, given that the tainted prices controlled for *all* of the suspension assemblies purchased by Seagate (whether understood as purchased by Seagate LLC or its

foreign affiliates), that "effect" proximately caused the injury (the overcharge) suffered by the plaintiffs.

Put simply, the domestic effects exception ensures exactly what one would expect. When a foreign company comes to the United States and bids with competitors while negotiating with a United States company over a contract that fixes all material terms of sale, those foreign competitors must play by the U.S.'s rules for competition. The FTAIA's terms communicate that plainly.

NHK tries to evade the effects exception at each step of the analysis. But before turning to its arguments, it is worth noting that NHK does *not* try to defend the district court's rationale. NHK does not dispute that the "gives rise to" element means merely that the domestic "effect" must be a proximate cause of the plaintiff's injury. NHK Br. 34-37, 46. Nor does NHK dispute that foreign plaintiffs' claims may be recognized under the effects exception. NHK Br. 46-47. For these reasons, NHK does not defend the district court's erroneous view that the domestic "effects" under the FTAIA must be the same as the "antitrust injury" suffered by the plaintiff. 1-ER-15. *See also* Seagate Br. 40-48 (explaining why the district court was wrong).

14

1. NHK tells this Court that "[l]ocating an 'effect' on 'commerce' at the time of negotiations confuses anticompetitive *conduct* with the *effects* of that conduct." NHK Br. 40 (emphases original). But NHK conflates its anticompetitive conduct with the result or effect of that conduct: the tainted terms adopted. It makes no sense to say that the agreed *terms* were the anticompetitive conduct, as that would imply that Seagate *participated in* the anticompetitive conduct by which it was injured. In truth, the anticompetitive conduct is the *conspiracy* not to compete. That is the conduct that violates the Sherman Act and on which the FTAIA focuses. *Kruman*, 284 F.3d at 398 ("'[C]onduct' only refers to acts that are illegal under the Sherman Act."). A "direct, substantial, and reasonably foreseeable" *effect* of that conspiracy was the tainted contract. 15 U.S.C. § 6a(1).

Numerous cases confirm that the relevant anti-competitive "conduct" is the conspiracy, and that the tainted prices (and other terms) are its domestic "effects." The courts consistently hold that the communications between co-conspirators and acts in furtherance of a price-fixing conspiracy are "conduct" for purposes of the effects exception. *See, e.g.*, *Empagran*, 542 U.S. at 159, 164 (discussing "price-fixing conduct"); *Hsiung*, 778 F.3d at 757-58 (identifying "conduct" as "Crystal Meetings"

15

at which competitors fixed prices). And in cases where that conspiracy culminated in a U.S.-based master agreement akin to the PSA, the corrupted negotiating process and anticompetitive terms of that agreement are considered an "effect." *See, e.g.*, *Hsiung*, 778 F.3d at 759; *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 2021361, at *4 (N.D. Cal. May 12, 2017); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 785 F. Supp. 2d 835, 842-43 (N.D. Cal. 2011); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 962 (N.D. Cal. 2011). NHK seeks to dismiss these cases because of their procedural posture, see NHK Br. 45-46, but each ruled, as a matter of law, that the execution of a master agreement in the United States is an "effect" that could "give rise" to a foreign plaintiff's claim within the meaning of the FTAIA.

Indeed, NHK has itself acknowledged that the relevant anticompetitive conduct was the *conspiracy*. In response to Seagate's argument that the FTAIA did not apply because NHK's anticompetitive conduct took place in the United States, NHK defined its anticompetitive "conduct" broadly to include "meetings and activities … in Asia, … where the conspirators are alleged to have orchestrated the conspiracy." NHK Br. 19-20. Though that recounting leaves out the important role played by

16

NHK's U.S.-based staff and subsidiary, *see e.g.*, 6-ER-994-1019; 6-ER-958, what matters here is that the relevant "conduct" was the conspiracy.

2. NHK asserts that the *only* domestic effects of the conspiracy contemplated by the effects exception are the supracompetitive prices that were eventually paid by U.S. entities downstream (*e.g.*, a Dell or HP or other importer of a drive containing the suspension assembly). NHK Br. 38-40. This argument depends on the unfounded view that the FTAIA ignores the most immediate domestic effect of the anticompetitive conduct and aims only at *later* downstream domestic effects. Moreover, it wrongly focuses exclusively on price effects, when bid-rigging cartels produce numerous other anticompetitive effects, including limiting output, preventing innovation, and diminishing product quality. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940); ███ ███ ██████████████████████████████████████ In truth, NHK offers no basis to treat overcharges as qualifying "effects" when they are paid downstream but not when they are imposed and agreed to upstream in the United States.

NHK's presumes that the "effect" required by the FTAIA must have no foreign element at all. NHK Br. 45. But no case so holds, and for good

17

reason: it would authorize foreign companies to engage in significant anticompetitive conduct where the effects are shared both here and abroad. That, however, misreads the FTAIA's reference to effects "on trade or commerce which is not trade or commerce with foreign nations." 15 U.S.C. § 6a(1)(A). The language must be read in context; it occurs in parallel with references to effects on "import trade or import commerce with foreign nations" and to effects on "export trade or export commerce with foreign nations." *Id*. § 6a(1)(A)-(B). Under the FTAIA's schema, trade or commerce "with foreign nations" comes in two essential types—imports and exports—which the FTAIA treats differently.

Thus, "trade or commerce which is not trade or commerce with foreign nations" is that trade or commerce which is neither imports, nor exports, nor the wholly foreign commerce that the Sherman Act never reached. The text is "phrased awkwardly," *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 854 (7th Cir. 2012) (en banc), but the drafting choice is readily explained.

As many courts, including this Court and the Supreme Court have observed, the phrase captures what is fairly described as "domestic commerce." *Empagran*, 542 U.S. at 158, 159, 163; *Hsiung*, 778 F.3d at 748,

18

757. Original versions of the FTAIA had applied the effects exception to "commerce within the United States." H.R. 2326, 97th Cong. (1981). But multiple witnesses and legislators questioned whether and to what extent exports and imports were covered by that phrase. *E.g.*, *H.R. 2326 Hearing*, 97th Cong. at 16 (statement of Malcolm Baldrige Jr., U.S. Sec'y of Com.); *id.* at 56, 120-21 (statement of Rep. John Seiberling, Jr.); *id.* at 245 (Am. Bar Ass'n, Report: *Purposes and Provisions of H.R. 5235* (Oct. 26, 1981)). So Congress went with the phrase "trade or commerce which is not trade or commerce with foreign nations" because a phrase like "domestic commerce" was too ambiguous. Congress chose a precise but awkward "web of words," *Hsiung*, 778 F.3d at 751, but the meaning has not been lost on courts. Indeed, the official House Report repeatedly equates this category with "domestic commerce." H.R. Rep. No. 97-686, at 2, 8, 9, 10, 13, 18. There's no reason to read the FTAIA as comprehending effects on imports or exports, but not on other domestic commerce because it involved some foreign actor.

NHK reads the Seventh Circuit's opinion in *Motorola* to mean that price-fixed contract terms are not domestic "effects" cognizable under the FTAIA. NHK Br. 42-43. But *Motorola* does not say that and, if it did, it

would conflict with this Court's analysis of the same facts in *Hsiung*. *See Hsiung*, 778 F.3d at 759. In all events, *Motorola*'s application of the effects exception follows from the erroneous view that the FTAIA permits no suit based on a foreign injury. *See* Seagate Br. 47. NHK does not even try to defend that proposition, so this Court can disregard NHK's reliance on *Motorola*'s consequentialist musings about the "mind boggl[ing]" prospect of foreign plaintiffs bringing Sherman Act claims. NHK Br. 43 (quoting *Motorola*, 775 F.3d at 826). There is nothing "mind-boggling" about what Seagate proposes here: only those few foreign plaintiffs whose injuries were proximately caused by effects (or non-export conduct, *see supra* pp. 5-12) *in the United States* can sue.

3. Finally, NHK argues that the price-fixed contract terms did not proximately cause the injury that "gave rise to" the claims of Seagate Thailand or the other affiliates. NHK Br. 47-48. The facts could not more clearly say otherwise.

As we have explained, the PSA was a long-term master agreement that, as regularly amended, ████████████████████████████ ████████████████████████████████████████ 7-ER-1132; *see* 5-ER-797 ███████████████████████████; 6-ER-904 (example

20

PSA); 6-ER-922-26 (example pricing amendment). ████████████████

████████████ 7-ER-1133. ███████████████████████

██████████████ 7-ER-1132. As NHK admits, the ███████

████████" when the PSA or amendments to it were agreed to and exe-

cuted in the United States. 6-ER-1023-24. Construing all facts in the light

most favorable to Seagate, a reasonable juror could readily find proximate

causation between the PSA's terms and Seagate Thailand or Seagate Sin-

gapore paying a supracompetitive price.

    Indeed, ██████████████████████████ the precise

supracompetitive price fixed by NHK and its coconspirators.[2] 5-ER-698.

████████████████████████████████

████████████████████████████████

██████. 7-ER-1135; 7-ER-1143; *see also* 5-ER-772-73; 5-ER-847; 5-ER-862.

To the contrary, "████████████████████████████

████████████████████████████████

<hr>

[2] In truth, the supercompetitive price was paid ████████████████
████████████████████ 5-ER-848. The foreign affiliates acted as
Seagate LLC's agents in disbursing payment and taking title to the sus-
pension assemblies. *See infra* pp. 30-35.

21

██████████████████████████████████████████

██████  5-ER-697.

NHK points to cases it says concluded that the corrupted master agreement negotiated in the United States (the domestic effect) did not cause the injury to the foreign affiliate who proceeded under the master agreement. *See* NHK Br. 42-44 (citing *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 11513316, at *6 (N.D. Cal. Dec. 18, 2017)); *Sun Microsys. Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1186-90 (N.D. Cal. 2009)). But those decisions turned on the independence of the foreign affiliates, who "took charge of their own … purchases." *Sun Microsys.*, 608 F. Supp., 2d at 1189. And in *Optical Disk Drive* the court concluded that the effects exception applied to the portion of components that, though initially sold abroad, eventually were received by U.S. companies—here 33% of the total. 2017 WL 11513316, at *5.

NHK lumps *Motorola* in with these decisions. But the Seventh Circuit never analyzed whether a higher price in a master agreement could be a proximate cause of an injury abroad. In *Motorola*, the sole plaintiff was the U.S.-based firm (Motorola), and no claims were brought on behalf of the foreign subsidiaries. Thus, the Seventh Circuit held only that

Motorola's "approval of a single, artificially-inflated LCD panel price" as part of a master agreement could not have proximately caused U.S.-based Motorola's damages because "Motorola's foreign subsidiaries" (who were not purchasing agents) were overcharged first, before the component parts made their way to the Motorola parent. 775 F.3d at 823-24. If anything, that suggests that *foreign affiliates*—like some of the Seagate plaintiffs here—*do* meet the standard for proximate cause.

NHK's argument (at 47) that the PSA and its amendments did not themselves effectuate a sale of goods is both wrong and a red herring. NHK's own witnesses admitted the ███████████████ by the PSA. 6-ER-1023-24. Moreover, once the key price and allocation terms were finalized,

███████████████████████████████████████

████████████████████████ 5-ER-697-98; 7-ER-1132. █████

███████████████████████████████████████

███████████████████████████████████ 7-ER-1135; 5-ER-846. That kind of "concrete link" between the PSA and the injury to the foreign affiliates easily satisfies the demands of proximate cause. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d at 962; *cf. Empagran*, 542 U.S. at 172 (collecting cases where Sherman Act applied

because "the foreign injury was dependent upon, *not independent of,* domestic harm" (emphasis original)).

## II. SEAGATE MAY PURSUE CLAIMS FOR THE PRICE-FIXING OF PRODUCTS INCORPORATED INTO HARD DRIVES FOR IMPORT INTO THE UNITED STATES.

### A. The import exclusion preserves these claims.

If this Court proceeds further, Seagate's claims involving the 33% of suspension assemblies that were incorporated into hard drives for import into the United States should be restored. The price-fixing of these suspension assemblies was plainly "conduct involving … import trade or import commerce." 15 U.S.C. § 6a. The import exclusion applies not only to the conduct of importers, but to all "anticompetitive behavior … directed at an import market." *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 470 (3d Cir. 2011) (cleaned up). Thus, the FTAIA's "import exclusion" also subjects NHK to the Sherman Act.

NHK's price-fixing *involved* "import trade or import commerce" because NHK fixed the prices of suspension assemblies that, at the time they negotiated the PSA, all parties understood would be imported into the United States. NHK in fact ██████████████████████

████████████████████████████████████████

24

███████ 6-ER-1050-63. To that end, ██████████████████████████

████████████████████████████████ 5-ER-849-57.

Once again, NHK does not defend the district court's rationale that, to qualify for the import exclusion, "a defendant or co-conspirator must be the entity sending the goods into the United States." 1-ER-12. Instead, NHK asserts that the import exclusion applies only where the defendant's conduct "includes or acts directly upon" import commerce. NHK Br. 21-25. NHK self-servingly chose the words "includes" and "acts directly upon," which appear nowhere in the statute, NHK in turn gives those words their most formalistic and rigid meaning. NHK thus claims it escapes liability solely because it transferred its price-fixed products overseas. But the import exclusion comprehends no such loophole. *Cf.* 1-SER-19 (Antitrust Guidelines) ("[A] firm cannot escape liability for unreasonably restraining or monopolizing import commerce by outsourcing the delivery of its product to the United States.").

Rather, as Seagate has explained, the FTAIA not only subjects "import trade" to the Sherman Act, it subjects the farther-reaching "import commerce" too. Seagate Br. 52. Further, the FTAIA reaches beyond conduct *within* "import commerce" to all "conduct *involving* import

commerce." 15 U.S.C. § 6a (emphasis added). "[T]he words 'involving commerce' are broader than the words of art 'in commerce'" and "therefore cover more than 'only persons or activities within the flow of interstate commerce,'" but also conduct that "includes or affects" the operations of import commerce. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74 (1995) (cleaned up); *accord Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 112 (2001).

Indeed, the word "involving" as used in the import exclusion *has* to be read this broadly. Under NHK's own view, the FTAIA is triggered at all, and the Sherman Act is even *potentially* inapplicable, only because the term "involving" in the first sentence of the Act reaches broadly enough that the conduct of a U.S.-based subsidiary rigging bids in Minnesota is "conduct *involving* trade or commerce … with foreign nations." 15 U.S.C. § 6a. The "involving" relevant to the import exclusion is the same word in the same statute. There is no basis to construe "involving" broadly for some purposes but narrowly for others.

NHK tries to offer a reason, arguing that the import exclusion "must be given a relatively strict construction," lest it render the effects

26

exception "superfluous." NHK Br. 23, 28 (citations omitted). But that reason fails inspection.

Even under the plain reading of "involving" as reaching all conduct "directed at an import market," the import exclusion and effects exception do separate work. *Animal Sci. Prods.*, 654 F.3d at 470. The effects exception inquires into whether the domestic or import effect was "direct, substantial, and reasonably foreseeable" and proximately caused the plaintiff's claimed injury. The import exclusion, by contrast, is categorical. When the conduct "involved … import commerce," courts need not consider the foreseeability or substantiality of the effect or its connection with the injury.

Nor is there risk of rendering the effects exception superfluous. There is a long list of foreign anticompetitive conduct that could be subject to the Sherman Act by virtue of its domestic effects but that is not "directed at an import market." *Animal Sci. Prods.*, 654 F.3d at 470. Consider a claim against an international monopolist of a service that cannot be imported. *E.g.*, *Shields v. Fed'n Internationale de Natation*, 419 F. Supp. 3d 1188, 1218-19 (N.D. Cal. 2019). Consider also an international cartel that keeps a global competitor from doing business in the U.S.

market. *E.g.*, *CSR Ltd. v. CIGNA Corp.*, 405 F. Supp. 2d 526, 551 (D.N.J. 2005). Or consider if foreign buyers engage in a group boycott of a U.S. based supplier. *E.g.*, Final Judgment, *United States v. Pilkington plc*, 1994 WL 750645 (D. Ariz Dec. 22, 1994). In all of these cases, the effects exception operates where the import exception does not.

NHK rests its "strict construction" argument on three out-of-circuit cases. NHK Br. 23-24 (discussing *Biocad JSC*, 942 F.3d 88; *Kruman*, 284 F.3d 384; *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293 (3d Cir. 2002), *overruled in part by Animal Sci. Prods*, 654 F.3d 462). Yet none of these cases addressed the situation here, where NHK fixed the prices of components of imported goods. Indeed, in none of them did the anticompetitive conduct concern a flow of goods into the United States.

NHK also questions the relevance of cases that interpret the same words—"involving commerce"—as used in the Federal Arbitration Act. NHK Br. 27-28 (citing *Cir. City Stores*, 532 U.S. at 112 and *Allied-Bruce*, 513 U.S. at 273-74). According to NHK, these cases construed "involving commerce" broadly because the FAA is an exercise of and gloss on the Commerce Clause. Yet the FTAIA is *also* an exercise of and gloss on the

28

Commerce Clause—both commerce "with foreign nations" and "commerce among the several states." *See supra* pp. 9-10.

NHK's allusions to potential "issues of international comity" are of no moment here. NHK Br. 25. NHK came to this country to carry out a price-fixing scheme on U.S. soil. That scheme succeeded, resulting in the corrupted, domestically executed PSA and amendments. Under any conception of the demands of comity, the application of U.S. law is permissible. *See* Fed. Trade Comm'n, U.S. Dep't of Justice, *Antitrust Guidelines for International Enforcement and Cooperation*, at 28 (Jan. 13, 2017), https://tinyurl.com/3dhyr6kb (listing comity factors); *Mujica v. AirScan Inc.*, 771 F.3d 580, 604 (9th Cir. 2014) ("the location of the conduct in question" is first comity factor). And the comity concerns here were settled when NHK pled guilty to a criminal action brought by the United States for the same conduct.

## B. The import effects exception also preserves these claims.

At a minimum, the district court erred by failing to apply the import *effects* exception. NHK's price-fixing conduct had a "direct, substantial, and reasonably foreseeable"—indeed, intended—effect on import commerce because it increased the prices of components imported into the

United States by Seagate LLC, thus giving rise to Seagate LLC's injuries. *See* Seagate Br. 61-64; *see also* 5-ER-755; 7-ER-1126-27 (establishing suspension assemblies' share of cost of imported product). Even assuming the only effect on import commerce is the higher price *paid* on suspensions that entered the United States (NHK's position), Seagate LLC was the party that paid this higher price first.

The trial court simply ignored the import effects exception. The court's opinion refers only to the "domestic effect exception." 1-ER-14. NHK mines the ruling for some consideration of the issue, but finds only quotations of generic language used to set up analysis of the domestic effects exception. NHK Br. 39 (citing 1-ER-14).

## III. THERE IS AT LEAST A TRIABLE ISSUE THAT SEAGATE LLC WAS THE DIRECT PURCHASER OF ALL SUSPENSIONS FROM NHK.

The district court also erred when it concluded that Seagate Thailand and Seagate Singapore were direct purchasers of the price-fixed suspension assemblies and that U.S.-based Seagate LLC[3] was an indirect purchaser who could not sue for damages. 1-ER-27-28. If there is at least

---

[3] NHK misleadingly refers to Seagate as an Irish company. NHK Br. 6. While Seagate LLC's parent is incorporated in Ireland, ███████████ ███████████████████████████. 7-ER-1122.

30

a fact question that Seagate LLC was the "direct purchaser," then Seagate LLC is entitled to a trial. NHK raises four objections to Seagate LLC's standing, but each is unavailing.

1. NHK urges this Court not to consider the issue. But this Court's jurisdiction extends beyond the particular question certified by the district court to the "*order*[*s*] certified." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996). Thus, this Court "may address any issue fairly included" in the certified orders, including the direct purchaser/agency issue. *Id.*; 1-ER-25-29 (certified order).

NHK says the direct purchaser question requires the application of law to facts, and so is unsuited to review now. NHK Br. 48-49. But the question here is whether the district court properly granted summary judgment to NHK on Seagate LLC's damages claim, which is a question of law. *See, e.g.*, *Canela v. Costco Wholesale Corp.*, 971 F.3d 845, 849 (9th Cir. 2020). Moreover, review of the direct purchaser question is essential to answering the FTAIA question. The FTAIA's effects exception requires knowing whether Seagate LLC has antitrust standing because the exception turns on whether the conspiracy's effect "gives rise to" its claim. 15 U.S.C. § 6a(2).

31

2. NHK does not dispute that if Seagate Thailand or Seagate Singapore were agents for Seagate LLC, then Seagate LLC was a direct purchaser with respect to those transactions. Instead, NHK argues that Seagate LLC's foreign affiliates were not its agents. NHK misleadingly portrays Seagate LLC and its affiliates as separate and independent cogs in a supply chain, minimizing the extensive evidence of their integration and control by Seagate LLC. Indeed, the evidence is largely undisputed *in Seagate's favor*, so there is plainly enough evidence to defeat summary judgment for NHK.

Whether Seagate Thailand and Seagate Singapore were agents of Seagate LLC's depends on three factors: "(1) a manifestation by the principal that the agent shall act for him; (2) that the agent has accepted the undertaking; and (3) that there is an understanding between the parties that the principal is to be in control of the undertaking." *Sun Microsys.*, 608 F. Supp. 2d at 1187-88.

NHK argues that Seagate Thailand and Seagate Singapore failed the first factor because each affiliate's acquisitions of suspension assemblies were "acts on its own behalf." NHK Br. 50. But a trier of fact reviewing the evidence could readily disagree. ███████████████



5-ER-696-97 (emphasis added); *see also* 5-ER-706

5-ER-771-73, 798-800, 824, 832, 846-48; 6-ER-954; 7-ER-1135, 1143.

NHK separately asserts that Seagate Thailand lacked an "agreement or understanding" that it was acting at Seagate LLC's behalf or Seagate LLC's control. NHK Br. 52. Again, that ignores what Seagate Thailand actually said.

5-ER-697. Seagate Thailand could not

5-ER-697. Seagate

Thailand likewise ███████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ 5-ER-697; *see also* 5-ER-698-99, 824; 6-ER-954. There was nothing about the acquisition of suspension assemblies that Seagate LLC did not control.

Finally, NHK wrongly claims that a later "intervening purchaser in the supply chain" would mean Seagate LLC is an indirect purchaser. NHK Br. 52. The direct purchaser analysis does not depend on later-in-time events. *See Apple Inc. v. Pepper*, 587 U.S. 273, 281-83 (2019); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 7805628, at *13 (N.D. Cal. Aug. 4, 2016), *rev'd and remanded on other grounds,* 720 F. App'x 835 (9th Cir. 2017). Seagate LLC was the direct purchaser because it made the purchase in the first instance through a purchasing agent (in most instances, Seagate Thailand).

3. NHK suggests that the "distinct economic entity" doctrine means that the foreign entities cannot have been acting as Seagate LLC's agents, NHK Br. 52-54, but NHK gets the doctrine backwards. NHK has identified no case holding that a buyer who uses a purchasing agent ceases to be a direct purchaser because that bona fide agent is a "distinct

34

economic entity." Such a rule would make no sense given that agents are commonly "distinct" entities from their principals. The doctrine instead concerns purchasing agents' standing to sue. *See In re Cathode Ray Tube*, 2016 WL 7805628, at *15.

4. Lastly, NHK argues that "Seagate's agency theory would not change the FTAIA outcome." NHK Br. 54. That argument is groundless. NHK argues that the Sherman Act does not apply here because Seagate's foreign subsidiaries, not the domestic Seagate LLC, paid for the suspension assemblies. Remove that premise and all you have is a straightforward domestic antitrust claim: NHK comes to the United States purportedly to compete with its competitors for sales of suspension assemblies, instead fixes prices and divides the market with its competitors and signs the PSA with a United States company who then buys those price fixed suspension assemblies from NHK. Nothing in the FTAIA or any sound policy would allow a foreign company to behave that way when selling to a U.S. company *in the United States.*

35

# CONCLUSION

For the foregoing reasons, and those stated in our Opening Brief, this Court should reverse the district court's orders.

Date: April 2, 2025

/s/ *Robert N. Hochman*
Robert N. Hochman

Robert N. Hochman
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
rhochman@sidley.com

David R. Carpenter
Nicole M. Baade
SIDLEY AUSTIN LLP
350 S Grand Ave.
Los Angeles, CA 90071
(213) 896-6000
drcarpenter@sidley.com

Jeremy D. Rozansky
SIDLEY AUSTIN LLP
1501 K St. NW
Washington, DC 20005
(202) 736-8000
jrozansky@sidley.com

Steffen N. Johnson
John B. Kenney
WILSON SONSINI
GOODRICH & ROSATI, PC
1700 K Street, N.W.
Washington, DC 20006
(202) 973-8800
sjohnson@wsgr.com

Kenneth O'Rourke
Jeff VanHooreweghe
Mikaela E. Evans-Aziz
WILSON SONSINI
GOODRICH & ROSATI, PC
One Market Plaza
San Francisco, CA 94105
(415) 947-2000

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-1(b) because it contains 6,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 365 word processing system in 14-point Century Schoolbook font.

Date: April 2, 2025

*/s/ Robert N. Hochman*
Robert N. Hochman

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that an electronic copy of the foregoing was emailed to counsel for Defendants-Appellees at their registered email address.

Date: April 2, 2025

_/s/ Robert N. Hochman_
Robert N. Hochman

*Attorney for Plaintiffs-Appellants*